**Julia CATRAIN, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 03 CV 3091(NG).**

United States District Court, E.D. New York.

July 16, 2004.

Julia Catrain, Long Island City, NY, pro se.

Christopher James Bowes, Center for Disability Advocacy Rights, New York, NY, Daniel D. Kuhn, Kuhn and O'Toole, LLP, Staten Island, NY, for Plaintiff.

Leslie A. Ramirez–Fisher, United States Attorney, Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

GERSHON, District Judge.

Plaintiff Julia Catrain brings this action pursuant to Section 405(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). Both parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Plaintiff filed an application for DIB and SSI benefits on November 30, 2001, alleging that, as of September 15, 2001, she was unable to work because of visual and mental functional limitations. Following the denial of benefits on April 15, 2001, Administrative Law Judge Sol Wieselthier ("the ALJ") held an administrative hearing on October 29, 2002. On January 23, 2003, the ALJ found that plaintiff was not entitled to benefits because she was not disabled within the meaning of the Social Security Act during the relevant period and was able to return to her past relevant work as a customer service representative. The ALJ's decision, which covered the period of September 15, 2001 through January 23, 2003, became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 22, 2003. This action followed.

### Plaintiff's Testimony

Plaintiff, accompanied by a paralegal, testified on October 29, 2002. The ALJ agreed to keep the record open for two weeks in order to obtain a visual and mental examination report.

Plaintiff testified that she was born on March 27, 1955, in the Dominican Republic. She came to the United States in 1965 and is a naturalized citizen. Plaintiff received a two-year college degree in 1968, gave birth to a daughter in the early 1970s, and now has a granddaughter. Plaintiff worked as a customer service representative from 1966 through 1975 and from 1981 to August 2000. She answered telephones, processed claims and visited health facilities. From December 2000 to May 2001, plaintiff worked for the New York City Parks and Recreation Department where she answered telephones and processed account records. Plaintiff testified that she was fired in May 2001 because she could not perform her job due to poor vision and inadequate training. The Parks and Recreation Department was also making cutbacks at the time and has not hired anyone since plaintiff was fired.

Plaintiff stated that she became disabled on September 15, 2001 from headaches and problems with her vision. Plaintiff testified that she was depressed, frustrated, and had mood swings. She indicated that she first had bipolar disorder in 1996.

Plaintiff has been living alone for four years. Plaintiff testified that she has not driven since 1995 because of her vision loss. During the five months prior to the hearing, plaintiff had to take taxis or receive rides from her neighbors in order to get around because of decreased vision. Prior to that, plaintiff took the subway alone approximately twice a week in order to see doctors. Plaintiff testified that she had difficulty with personal care and had assistance doing her activities of daily living such as shopping for groceries and doing her laundry.

### Medical Evidence—Thyroid Cancer

1. *Treating Physician*

a) *Dr. Yaron Tomer*

In 1997 and 1998, plaintiff was treated for thyroid cancer. Her thyroid gland was removed and Dr. Tomer provided follow-up care. Dr. Tomer prescribed Synthroid to replace the thyroid and help diminish sleeplessness and fatigue. Plaintiff has not suffered any recurrence of cancer in follow-up tests.

In June 2001, Dr. Tomer completed a medical questionnaire for the New York State Education Department, Office of Vocational and Educational Services for Individuals with Disabilities ("VESID"). Plaintiff was applying to medical assistance training programs through VESID. Dr. Tomer reported normal physical findings and recommended a disability specialist to determine plaintiff's functional status.

In October 2001, Dr. Tomer completed a disability questionnaire for plaintiff's Medicaid application. Dr. Tomer stated that plaintiff had the ability to perform "light" to "medium" work activity. He noted that plaintiff had normal non-exertional functions including sensory, postural, mental, and manipulative functions.

In December 2001, plaintiff complained of tiredness and headaches. Dr. Tomer found no evidence of recurrence of cancer. Dr. Tomer stated that he was treating plaintiff only for her thyroid condition, was not plaintiff's primary physician, and could not comment on her ability to do work-related activities.

### Medical Evidence—Visual Impairment

1. *Treating Specialists*

a) *Dr. Robert Zoltan*

In June 2001, plaintiff's corrected visual acuity in the right eye was 20/25 and in the left eye was 20/30. Surgery was not recommended as her vision could be corrected with glasses. In December 2001, ophthalmologist Dr. Zoltan reported that plaintiff had "significant cortical cataracts" in the lens of each eye and recommended surgical correction. Uncorrected visual acuity was 20/200 in both eyes while corrected visual acuity was 20/40.

b) *Dr. Murray Meltzer*

In February 2002, Dr. Meltzer, plaintiff's eye surgeon, evaluated plaintiff's vision and removed the cataract in the left eye. Post-surgery, plaintiff's corrected visual acuity in the left eye was 20/50 and in the right eye was 20/30. Uncorrected visual acuity in both eyes was 20/400. He noted that the intermittent pain in her left eye, for which she took Tylenol with codeine, did not affect plaintiff's daily living activities and there were no limitations on plaintiff's ability to sit, walk or stand although there was limitation on her ability to lift and carry. He also reported that physical findings were not consistent with plaintiff's level of pain. In April 2002, Dr. Meltzer reported that plaintiff had healed well but slowly. He stated that, with corrected vision of 20/30, she was able to read small print as of March 27, 2002.

Plaintiff tripped and sprained her ankle in May 2002. At Mount Sinai's emergency room, Motrin and Tylenol codeine was prescribed.

c) *Dr. Amr Naydel*

Plaintiff's primary care physician Dr. Naydel saw plaintiff on July 1, 2002, for a complaint of blurry vision in her left eye. He found diminished vision in her left eye and noted her anxiety. Upon further examination by an ophthalmologist, plaintiff was diagnosed with retinal detachment of the left eye and underwent surgery.

Dr. Naydel saw plaintiff on July 31, 2002 and noted plaintiff was status post retinal surgery and was seeing a psychiatrist for

bipolar disorder. Plaintiff was taking Levoxyl, Serzone, Clonazepam. Plaintiff was stable on Serzone and Ativan.

In an application for reduced-fare Metrocard that was completed in August 2002, Dr. Naydel estimated plaintiff's vision problems, sprained ankle, and bipolar disorder would last less than twelve months.

In August 2002, plaintiff slipped in the bathtub and injured her left foot.

Dr. Naydel reported in September 2002 that plaintiff had difficulty accomplishing activities of daily living and was anxious and depressed due to the deterioration in her vision. He completed a medical request for home care in September 2002. He noted vision loss, cataract in the right eye, status post surgery for retinal detachment in the left eye, hypothyroidism, and bipolar disorder in addition to multiple falls due to poor vision. Dr. Naydel stated that plaintiff needed chore services (cleaning, laundry, meal preparation, shopping, reheating meals) and personal care service along with a cane, a bath bar, grab bar, and shower handle. She was on Levoxyl, Serzone, Paxil, Naproxen.

#### d) Dr. Uri Shabto

Dr. Shabto, who had performed surgery on the retinal detachment in plaintiff's left eye in July 2002, stated in September 2002 that the surgery was successful. He noted that plaintiff had a loss of vision in her right eye due to a "visually significant" and "progressive" cataract and referred her for cataract removal.

#### e) Arlene Schwartz, O.D. and Judy Lo, O.D.

Dr. Schwartz of the State College of Optometry at the State University of New York examined plaintiff on October 22, 2002 and stated that plaintiff has a moderately severe cataract in her right eye and history of retinal detachment in her left eye, both of which give her reduced vision. She found plaintiff's best corrected visual acuity was 20/60 in the right eye and 20/200 in the left eye. Dr. Lo examined plaintiff on October 24, 2002 and noted that her corrected visual acuities were worse than 20/200 in both eyes, rendering her legally blind. Dr. Lo also noted that there was a large cataract in the right eye. She referred plaintiff to a retinal specialist for evaluation due to the drastic change in vision since Dr. Schwartz's examination two days earlier.

#### f) David Horn O.D., Sherry Bass O.D., Robyn Wolintz M.D.

Over three visits with retinal specialists at the State College of Optometry at the Statute University of New York on October 21, November 13, and November 18, 2002, the doctors found that plaintiff's corrected visual acuity varied from 20/80 to 10/600 in the right eye and varied from light projection to 20/400 in the left eye. Internal examination of the fundus showed no significant findings of the right eye and a stable scleral buckle 360 degrees in the left eye. All other findings were unremarkable. The cornea and anterior chamber were normal with no signs of inflammation. Pupils were reactive with no afferent pupillary defect (APD). The doctors found a moderately large mixed cataract in the right eye. The left eye had a clear posterior chamber intraocular lens. Visual evoked potentials showed a sluggish response in the right eye but indicated that plaintiff should have visual acuity of 20/30 or 20/40. Visual evoked potential of the left eye showed a flash response that was not consistent with plaintiff's subjective visual acuity. Dr. Horn stated that, in summary, plaintiff had variable visual disturbance complaints that are not consistent with retinal, neurological or ocular findings. They rec-

ommended a follow-up in two months. There is no record of a follow-up.

### Medical Evidence—Psychiatric Impairments

1. *Treating Specialists*

a) *Gus Papapetrou, Ph.D.*

In September 2001, Dr. Papapetrou performed a psychological evaluation of the plaintiff in connection with her application to the VESID program for purposes of developing a plan for vocational rehabilitation. Plaintiff appeared "very agitated and anxious" during testing. Dr. Papapetrou noted that the symptoms of "overwhelming" anxiety appeared to be caused by neurosis. Plaintiff was diagnosed with acute stress disorder. Dr. Papapetrou recommended individual psychotherapy to help decrease acute anxiety and stress and noted that, until plaintiff's emotional state was more stable, it would be difficult for plaintiff to move through the VESID referral process. He noted that once she was more stable, plaintiff could work but should be given only clerical work with minimal stress component since she was "quite vulnerable to stress factors."

Plaintiff enrolled as a full-time student at the Plaza Business Institute Medical Office Assistant program through VESID on October 1, 2001.

b) *Dr. Marguerite Lederberg*

On March 8, 2002, plaintiff's case manager at VESID made a note indicating plaintiff had "emotionally spun out of control" at the Plaza Business Institute and was making demands on a variety of sources. On March 12, 2002, plaintiff's case manager and the Dean of the Plaza Business Institute met with plaintiff, telling her that her behavior was unacceptable and recommending therapy and a leave of absence. They stated that, upon successful therapy, they would consider allowing plaintiff to return to the VESID program.

Plaintiff agreed to seek psychiatric treatment at the Bleuler Clinic in Forest Hills.

Dr. Lederberg of the Memorial Sloan Kettering Hospital evaluated plaintiff on April 3, 2002 in order to devise a plan of treatment to address plaintiff's erratic behavior while she was attending the Plaza Business Institute. Plaintiff told Dr. Lederberg that she got "violent, with words" and was told that she needed therapy. Plaintiff stated that she heard her father's voice and called out to him, but she denied any other auditory phenomena. There was no thought insertion or delusions. There was no history of attempted suicide, psychiatric hospitalization, frank obsessive or compulsive behaviors. Plaintiff described herself as being suspicious and impatient, noting a long history of being demanding and rude.

Plaintiff was well-groomed and did not have abnormal gait and station or muscle movements. Dr. Lederberg found her thought process to be chaotic, circumstantial and tangential but not bizarre. Plaintiff's associations were loose but each individual story was consistent. Plaintiff was alert and oriented, had normal language skills, and did not have abnormal or psychotic thoughts. Plaintiff's mood and affect were anxious, depressed and frightened. She had immediate recall of two out of three items. Dr. Lederberg found plaintiff's attention span and concentration to be impaired as she performed poorly on serial sevens (a test of concentration measuring the ability to accurately subtract 7 from 100, then 7 from 93, then 7 from 86, etc.).

Dr. Lederberg found that plaintiff's symptoms of irritability could be related to depression and that her inappropriateness was "marked." Plaintiff's thought process could represent acute anxiety and the cognitive confusion associated with depression rather than primary thought disorder.

The doctor stated that it was possible that plaintiff had a mixed manic disorder with a thought disorder but no other psychotic phenomena. She diagnosed chronic depression, rule out mixed manic state. She also noted plaintiff's past thyroid cancer and numerous life stressors. The plaintiff also displayed "moderately severe symptoms of psychomotor retarded depression."

Dr. Lederberg recommended psychiatric treatment, perhaps intensive, and referred plaintiff for further evaluation. She prescribed Zyprexa to address plaintiff's irritability and anxiety in addition to the Paxil plaintiff was already taking.

### c) Dr. Gary Weinstein

In April 2002, a certified social worker interviewed plaintiff at Bleuler Psychotherapy Center. Plaintiff identified her problem as "mood swings" and stated that she had been subject to unstable moods since her thyroid surgery. Plaintiff noted that she felt tired and yet at the same time had difficulty sleeping. The social worker described plaintiff as "too talkative and tangential" although she was "well-related" on mental status examination. Insight and judgment were both limited. The social worker noted that plaintiff appeared to have adequate self care, activities of daily living, and appropriate behavior. Her speech was articulate and fluent. She had good impulse control and her IQ was deemed adequate. Plaintiff denied delusions, ideas of reference, and thought disorder, although she did state she heard a voice calling her name. Plaintiff noted that she had lots of friends and was popular.

On June 4, 2002, Dr. Weinstein examined plaintiff. He found her behavior to be "intrusive [and] demanding" and that she had increased speech rate. Her mood was depressed and affect was "explosive." Thought process was circumstantial. Insight was limited and judgment improved to fair. Dr. Weinstein found no delusions, suicidal ideation, homicidal ideation, or hallucinations. Plaintiff had a cooperative attitude. Cognitive function with respect to sensorium, orientation, attention, concentration, short-term memory, long-term memory, abstraction and general information were all within normal limits. Dr. Weinstein diagnosed plaintiff with bipolar disorder not otherwise specified, rule out mixed bipolar disorder and rule out personality disorder. He assessed a score of 58 on a scale of 1 to 100 on the Global Assessment of Functioning ("GAF") Scale, which measures limitations on psychological, social and occupational functioning due to mental impairments.

### 2. Social Security Administration Consultative Specialists

#### a) Consultative Psychiatrist Joshua Algaze, M.D.

In December 2001, consultative psychiatrist Dr. Algaze examined plaintiff. He found plaintiff to be "anxious and tense" during the interview. Tr 263. Plaintiff reported frequent oversleeping and overeating. Plaintiff indicated occasional episodes of irritability and frequent anxiety regarding losing her vision. She further claimed a thirty year history of treatment for feelings of depression and anxiety. Plaintiff's speech was clear and well articulated and thinking was logical and coherent. There was no evidence of formal thought disorder. Dr. Algaze diagnosed an adjustment disorder and stated that plaintiff would have "mild difficulties in personal, social and occupational adjustment that impair her ability to tolerate work pressures." He opined that plaintiff had satisfactory ability to understand, carry out, and remember simple job instructions.

b) *Consultative Physician Malieckal, M.D.*

In March 2002, a non-examining physician reviewed the administrative record and determined that plaintiff had an adjustment disorder that was "not severe." Dr. Malieckal stated that there were only mild limitations in social functioning and no limitations in daily living, concentration, persistence and pace, and no episodes of deterioration.

### The ALJ Decision

The ALJ considered plaintiff's history of thyroid cancer, cataracts and eye surgeries and mental limitations and found that the medical evidence supported a finding that plaintiff did not have a severe mental impairment but that her combination of impairments was "severe" during the period in question. He further found that her impairments did not meet or medically equal one of the listed impairments. Based on plaintiff's contradictory activities and statements and on the medical documentation, the ALJ concluded that plaintiff's testimony concerning her impairments and their impact on her ability to work were exaggerated. Accordingly, the ALJ determined that plaintiff was not disabled within the meaning of the Social Security Act as she retained the residual functional capacity to perform the requirements for medium work activity, including her past relevant work as a customer service representative, and that her exertional capacity for such work is not significantly compromised by her non-exertional limitations.

The ALJ gave weight to endocrinologist Dr. Tomer's findings that plaintiff, whom he was overseeing for her recovery from thyroid removal, could perform light to medium work as of October 2001 and medium work activity as of November 2001. The ALJ did not credit Dr. Lo's reports on October 24, 2002, that both eyes had visual acuities worse than 20/200, thus rendering plaintiff legally blind. The ALJ noted that, on October 22, 2002, the plaintiff had 20/60 visual acuity in the right eye and worse than 20/200 in the left eye and, yet, two days later, both eyes were worse than 20/200. Citing Social Security Ruling 96-2p, the ALJ stated that Dr. Lo's opinion regarding the nature and severity of plaintiff's visual impairment is contradicted by substantial evidence and not entitled to controlling weight.

The ALJ gave controlling weight to Dr. Horn's statements, summarized over the course of three visits in October and November 2002 with retinal specialists, that plaintiff had variable visual disturbance complaints that are not consistent with retinal, neurological or ocular findings. This is supported by reports from other treating sources including Dr. Meltzer, Dr. Shabto, and Dr. Zoltan. The ALJ also credited the findings of treating physician Dr. Naydel who reported in August 2002 that plaintiff's duration of impairment will be less than twelve months.

The ALJ credited Social Security Administration psychiatric consultant Dr. Algaze's evaluation of plaintiff in December 2001. The ALJ noted plaintiff exhibited normal psychomotor activity, and there was no evidence of formal thought disorder. Furthermore, the ALJ stated that plaintiff was able to perform serial threes and could remember three out of three objects in three minutes. The ALJ also pointed to plaintiff's mild remote memory deficiency. Specifically, the ALJ noted Dr. Algaze's finding that plaintiff had adjustment reaction with anxiety and only mild difficulties in personal, social and occupational adjustments that impair her ability to tolerate work pressures. The ALJ also pointed to Dr. Algaze's opinion that plaintiff has satisfactory ability to understand, carry out and remember simple instructions and satisfactory ability to re-

spond appropriately to supervision, co-workers, and work pressures.

The ALJ stated that Dr. Algaze's opinion is supported by medical evidence, noting that no treating physician has specifically stated that plaintiff cannot work or is disabled as a result of her mental impairments. The ALJ acknowledged Dr. Papapetrou's finding of acute stress disorder in September 2001 and the outburst at the Plaza Business Institute in March 2002 that led to plaintiff's recommended leave of absence. He further commented that these were isolated incidents and no further incidents were reported. The ALJ evaluated the June 2002 findings of Dr. Weinstein of the Bueler Psychotherapy Center that plaintiff had normal cognitive functioning, in addition to the April 2002 findings of Dr. Lederberg that plaintiff was fully oriented, although with impaired attention and concentration. He concluded that these doctors supported the consultative examiner's finding that plaintiff's mental impairment only mildly affected her ability to work. The ALJ noted that Dr. Weinstein found a GAF score of 58 but did not further evaluate this score.

### Standard of Review

■ The court may set aside the Commissioner's decision only if it is based on legal error or her factual findings are not supported by substantial evidence. *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir.1997). The Supreme Court has defined the term "substantial evidence" in the social security context as being "more than a mere scintilla" and as that evidence which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). If substantial evidence exists in support of the ALJ's decision, the court must uphold the ALJ's decision, even if there is also

substantial evidence which supports plaintiff's arguments. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996). Furthermore, the ALJ's findings of fact are conclusive, even if the reviewing court's independent analysis may differ from the ALJ's analysis. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.1982).

### Discussion

Plaintiff argues that: (1) the ALJ failed to consider the effects of plaintiff's visual and mental limitations and (2) "new and material" evidence warrants remand pursuant 42 U.S.C. § 405(g).

■ Plaintiff contends that the ALJ improperly discounted evidence of plaintiff's visual limitations. Plaintiff points to the undisputed fact that the cataract in the left eye progressed between June and December 2001 and that, by December 2001, surgery was recommended to correct visual disturbance to both eyes. Plaintiff argues that this, coupled with the surgery for plaintiff's detached retina in the left eye in July 2002, the need of surgical correction for her right eye, and the two injuries plaintiff suffered in May and August 2002, suggest that there was enough evidence of visual limitation to warrant an inquiry into whether plaintiff could perform the visual demands of her past relevant work.

The ALJ credited the findings of specialist Dr. Horn who, after reviewing the results of three examinations conducted by himself and his associates in October and November of 2002, determined that plaintiff had a visual acuity of 20/30 or 20/40. Particularly important is Dr. Horn's statement that plaintiff's subjective visual acuity and complaints of pain were not consistent with objective clinical findings. Despite problems with her vision, plaintiff was attending school full-time at the Plaza Business Institute between Oc-

tober 2001 and March 2002. Furthermore, as the plaintiff admitted, when she was let go from her job in May 2001, allegedly due to "vision loss and improper training," the New York City Park and Recreation Department was downsizing and had not hired a new person between May 2001 and October 29, 2002, the date of her hearing before the ALJ. The ALJ may weigh conflicting medical evidence, and the ALJ's decision to credit the report of Dr. Horn, a retinal specialist, that is based on objective clinical findings, over the report of other less-specialized professionals, who reported more severe visual disturbances, was proper.

■ With respect to mental impairments, plaintiff argues that the ALJ disregarded plaintiff's mental functional limitations. The ALJ, however, specifically acknowledged that plaintiff suffers from a bipolar disorder. Plaintiff further asserts that the ALJ failed to evaluate the significance of a score of 58 on the GAF scale assigned by Dr. Weinstein.[1] Plaintiff notes that a showing of a score of 58 on the GAF scale reflects a finding of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or coworkers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, page 32. Plaintiff asserts that a score of 58 demonstrates that Dr. Weinstein did not believe plaintiff's mental limitations were mild or non-existent and that the ALJ simply stated the GAF score without giving it due evaluation. However, the GAF score is only one piece of evidence. The ALJ properly evaluated all the findings of treating and consultative psychiatric specialists to determine plaintiff's mental limitations and concluded that the bipolar disorder did not limit her ability to perform work activities.

Plaintiff points out that the ALJ noted that "there are no functional limitations reported by the claimant's psychiatrist" and argues that, having noted such a gap, the ALJ was obliged to fill this gap by asking Dr. Weinstein to produce an opinion as to plaintiff's functional limitations. There is, however, no gap in the record. Indeed, although Dr. Weinstein noted plaintiff's intrusive behavior, depressed mood, and "explosive" affect, he stated that plaintiff's cognitive function was normal, judgment was fair, and impulse was controlled. He diagnosed bipolar disorder and recommended supportive psychotherapy and Paxil, which plaintiff had been taking already after her thyroid cancer removal, but he otherwise found plaintiff to have normal mental status. Because the burden is on the plaintiff to prove that she is unable to do her past relevant work, the ALJ is entitled to rely on the absence of opinions that she is unable to do such work. *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir.1995).

■ Plaintiff also contends that the episode at Plaza Business Institute, where she was asked to take a leave of absence from the training program for engaging in "unacceptably demanding behavior," shows that plaintiff could not perform her job. However, after being put on medications in April 2002, the record does not show any other incident. The ALJ's conclusion that, although plaintiff may have had "an occasional episode of acute anxiety or stress as well as depression, they were of infrequent

---

1. Plaintiff asserts that Dr. Weinstein evaluated plaintiff in May and June 2002 and gave her a GAF score of 58 on both occasions. The record does not support this contention as a social worker met with plaintiff in April 2002, and Dr. Weinstein met with plaintiff only once, on June 4, 2002.

duration and occurrence," is supported by substantial evidence.

■ The ALJ also questioned plaintiff's believability, pointing to the fact that in June 2002, plaintiff was "holding herself out as ready, willing and able to work" in her efforts to obtain unemployment benefits. The ALJ found this statement to "contradict her own allegation and impede significantly on her credibility." This, coupled with plaintiff's ability to attend school full-time for six months with her alleged vision problems and immediately after a diagnosis of acute stress, further militates against her position. The ALJ's conclusion, based on these various factors, that, although plaintiff does have "medically determinable impairments which could reasonably cause the symptoms and limitations alleged, the claimant's impairments are grossly exaggerated and inconsistent with the medical documentation presented herein," was supported by substantial evidence.

■ Plaintiff also seeks a remand for further proceedings in order to submit "new and material" evidence, namely, three psychiatric reports by Dr. Jennifer Liu of Mount Sinai Hospital who met with plaintiff on December 10, 2002, March 25, 2003 and March 31, 2003, and a psychiatric report signed by Dr. Michael Gotts, Michelle Lask, and Lori Newshotz from November 2003.

■ The court may order that additional evidence be addressed by the ALJ, but only upon a showing that there is "new evidence, which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). In *Tirado v. Bowen*, 842 F.2d 595 (2d Cir.1988), the three-part showing required by this provision is summarized: "an appellant must show that the proffered evidence is (1) 'new' and not merely cumulative of

what is already in the record . . . and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. . . . Finally, claimant must show (3) good cause for her failure to present the evidence earlier" (internal quotations and citations omitted).

Dr. Liu's reports are clearly not material in that they would not have led to a different result. Dr. Liu reported that plaintiff was oriented, made good eye contact, had her memory intact, and appeared neatly groomed. Plaintiff was living independently, had goal-oriented thought processes, possessed good impulse control, and exhibited no psychotic symptoms. Although plaintiff had mild restrictions in daily living and in maintaining social functioning and marked limitation in the ability to establish interpersonal relationships, Dr. Liu noted that such difficulties were intermittent and improved with medication. Dr. Liu stated on all three visits that plaintiff was seeking employment. Dr. Liu did not mention any problems plaintiff had with task performance or concentration or any deterioration in work settings. Indeed, as defendant notes, Dr. Liu's findings support the ALJ's findings.

The psychiatric opinion of Dr. Gotts, Lask, and Newshotz was prepared almost ten months after the closing period of the ALJ's inquiry and, while it supports plaintiff's claim of disability, it does not report on her condition at the relevant time period. Given the full record of reports relating to that period, it cannot be said that that report would materially affect the decision.

In sum, the record established substantial evidence for the ALJ's decision. Accordingly, plaintiff's motion is denied, and defendant's motion is granted. The Clerk

of Court is directed to enter judgment for defendant.

**SO ORDERED.**